```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------x
IN RE AUTHENTIDATE                    :
HOLDING CORP.                         :
SECURITIES LITIGATION                 :          MASTER FILE
                                      :          05 Civ. 5323 (LTS)
This Document Relates To:             :
 All Actions                          :
------------------------------------------------------x
```

MEMORANDUM OPINION AND ORDER

In this securities action, Plaintiffs, a putative class of investors who purchased the stock of Defendant Authentidate Holding Corporation ("Authentidate" or "the Company") between January 15, 2003, and May 27, 2005, allege that Authentidate and individual Defendants (collectively, "the Defendants") failed to make proper disclosures regarding performance metrics in an agreement ("the Agreement") the Company had with the United States Postal Service to serve as the preferred provider of the Postal Service's electronic postmark ("EPM"), thereby artificially inflating the price of Authentidate common stock in order to, inter alia, attract capital and avoid insolvency. Plaintiffs assert violations of Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder, and of Section 20(a) of the Act. The Court has jurisdiction of this matter pursuant to 28 U.S.C. § 1331.

Defendants move to dismiss, with prejudice, lead Plaintiffs' Consolidated Second Amended Securities Class Action Complaint pursuant to Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure and the Private Securities Litigation Reform Act ("PSLRA.").

Familiarity with the factual background of the instant case, its procedural posture and the Court's prior decision is presumed. See In re Authentidate Holding Corp., No. 05 Civ. 5323 (LTS), 2006 WL 2034644 (S.D.N.Y. July 14, 2006). For the reasons that follow, Plaintiffs'

claims are dismissed with prejudice.

DISCUSSION

In deciding a motion brought pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure to dismiss a complaint for failure to state a claim, "the court must accept as true all of the well pleaded facts and consider those facts in the light most favorable to the plaintiff." Hudson Valley Black Press v. Internal Revenue Serv., 307 F. Supp. 2d 543, 545 (S.D.N.Y. 2004). "To survive dismissal, the plaintiff must provide the grounds upon which his claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level.'" ATSI Commcn's, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 98 (2d Cir. 2007) (quoting Bell Atl. Corp. v. Twombly, 127 S. Ct. 1955, 1965 (2007)). A court may consider, in deciding a motion to dismiss, documents that are integral to the complaint or are incorporated by reference in the pleadings. See I. Meyer Pincus and Assocs. v. Oppenheimer & Co., 936 F.2d 759, 762 (2d Cir. 1991).

In order to state a claim for securities fraud under Section 10(b) and Rule 10b-5 promulgated by the SEC thereunder (collectively, "Section 10(b)"), a plaintiff must demonstrate that "the defendant, in connection with the purchase or sale of securities, made a materially false statement or omitted a material fact, with scienter, and that the plaintiff's reliance on the defendant's action caused injury to the plaintiff." Ganino v. Citizens Utils. Co., 228 F.3d 154, 161 (2d Cir.2000). Section 10(b) claims are subject to the heightened pleading standards of Federal Rule of Civil Procedure 9(b), which requires that the pleadings "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." ATSI Commcn's, 493 F.3d at 99 (citation omitted). The PSLRA, which also applies in this private

securities law action, similarly requires in relevant part that, with respect to allegations of untrue statements of material facts or material omissions, "the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and [that], if an allegation regarding the statement or omission is made on information and belief, the complaint . . . state with particularity all facts on which that belief is formed." 15 U.S.C.A. § 78u-4(b)(1) (West 1997).

To state a claim under Section 20(a) of the Exchange Act, 15 U.S.C. § 78(t)(a) (for control person liability as to Section 10(b) claims), a plaintiff must allege (i) a primary violation by a controlled person, (ii) control by the defendant of the primary violator, and (iii) culpable participation.

Duty to Disclose

Plaintiffs argue that Defendants had a duty to disclose the Company's low level of EPM sales and their continuing or likely failure to meet the revenue metrics. For purposes of Section 10(b), "[s]ilence, absent a duty to disclose, is not misleading," Basic Inc. v. Levinson, 485 U.S. 224, 239 n.17 (1988), and an omission is actionable under the securities laws only when the Defendant was subject to a duty to disclose. See In re Time Warner Inc. Securities Litigation, 9 F.3d 259, 267 (2d Cir. 1993) ("[A] corporation is not required to disclose a fact merely because a reasonable investor would very much like to know that fact."). Thus, "[t]he initial inquiry in each case is what duty of disclosure the law should impose upon the person being sued." Chris-Craft Indus. Inc. v. Piper Aircraft Corp., 480 F.2d 341, 363 (2d Cir. 1973). Courts in this Circuit have identified a number of circumstances in the securities context where a duty to

disclose arises, including statutorily created disclosure duties, when disclosure is necessary to make prior statements not misleading, when it is necessary to update statements that may have become misleading as the result of intervening events or the passage of time, when an insider seeks to trade on the basis of information known only to her, and the presence of certain fiduciary relationships.  See In re Initial Public Offering Securities Litigation, 241 F. Supp. 2d 281, 381 n.150 (S.D.N.Y. 2003) (collecting cases).

Plaintiffs argue that Defendants had a duty to disclose the Company's continuing failure to meet the revenue metrics based on: (1) Item 303 of SEC Regulation S-K (17 C.F.R. § 229.303); (2) the Company's February 2004 Offering and Authentidate's "insider" status; and (3) the obligation to make prior statements not misleading.  The factual allegations in the complaint do not plausibly frame the existence of any of these duties to disclose, as the Court explains below.

### Item 303 of Regulation S-K

Item 303 of SEC Regulation S-K, entitled "Management's Discussion and Analysis of Financial Condition and Results of Operations," requires, in relevant part, that a registrant "describe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." 17 C.F.R. § 229.303(a)(3)(ii).  As the instructions to Paragraph 303(a) make clear, "[t]he discussion and analysis shall focus specifically on material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results or of future financial condition."  See

17 C.F.R. § 229.303(a), Instruction 3 (emphasis added).

Plaintiffs argue that the virtually nonexistent EPM sales and the likely failure to meet upcoming revenue metrics were "known trends or uncertainties" that Defendants should have disclosed in their various filings.  Plaintiffs fail, however, to put forth any particularized factual allegations making it plausible that these omissions caused any piece of existing "reported financial information" to misleadingly indicate a specific future result or financial condition. None of the reported financial information cited in the complaint could be read to predict a particular result, such as an impending boom in EPM sales, that was made unlikely by the actual, anemic level of EPM sales.  Nor could any of the reported monthly revenues cited in the complaint be read to suggest that robust EPM sales constituted, or would continue to constitute, a significant percentage of the reported monthly revenues.  See In re Scholastic Corp. Sec. Litig., 252 F.3d 63, 71 (2d Cir. 2001) (Item 303 duty to disclose existed where the complaint alleged that defendants failed to disclose a decline in sales constituting a substantial portion of existing trade business).  The complaint's repeated emphasis on the fact that Authentidate's total monthly revenues represented only a fraction of the monthly revenue required by the revenue metrics is irrelevant, because the actual revenue metrics were not public; therefore, the reported monthly revenues did not suggest that an imminent surge of EPM sales would suddenly increase Authentidate's total monthly revenues.  For all these reasons, the complaint fails to plead facts plausibly demonstrating the existence of a duty to disclose the EPM and revenue metrics information pursuant to Item 303.

*February 2004 Offering*

Plaintiffs argue that Authentidate had a duty to disclose lackluster EPM sales and a likely breach of the first revenue metric arose when it raised approximately $74,000,000.00 in proceeds through its February 2004 stock offering. However, as the Court has previously discussed in this matter, under the terms of Authentidate's agreement with the Postal Service, the period for achieving the revenue metrics was extended until July 2004, five months after the February 2004 offering. Statements about how many EPMs the Company would sell during the remaining five-month time period and whether the first revenue metric would be achieved would have been speculative at best, and Plaintiffs put forth no particularized allegations beyond the mere existence of minimal EPM sales suggesting that Authentidate should have known that such lackluster EPM sales were likely to persist during this five-month period. Plaintiffs' claim that Authentidate breached a duty by failing to disclose the existing levels of EPM sales is also unsupported by any particularized allegation plausibly demonstrating that such an omission was material because, even if the level of EPM sales had been disclosed, the public would not have known if the metric had been met or not since the revenue metrics were kept secret.[1] Nor do Plaintiffs cite any past statement concretely predicting or suggesting that the Company would achieve a certain level of EPM sales by a specific time period, such that Authentidate's failure to disclose the levels of sales in February 2004 constituted a material omission. See Schoenhaut v. Am. Sensors, Inc., 986 F. Supp. 785, 793 (S.D.N.Y. 1997) (the fact that sales to a particular customer were decreasing was not a material omission since the prospectus did not list current

---

[1] Plaintiffs do not allege that Defendants should have disclosed the actual revenue metrics as well. (See Opp'n at 16 ("Plaintiff is not complaining that Authentidate should have disclosed its internal EPM sales estimates or the Revenue Metrics").)

sales volumes to that customer, nor did it make predictions about future sales levels). Accordingly, the complaint fails to contain sufficient factual allegations that would plausibly demonstrate the existence of a duty to disclose in connection with the February 2004 offering.[2]

*Duty to Update Prior Statements*

Finally, Plaintiffs argue that Defendants had a duty to disclose the alleged omissions in order to render prior statements not misleading.  However, the factual allegations in the complaint are insufficient to demonstrate plausibly that any of the cited statements by Defendants were rendered materially misleading as a result of the omissions.

Nothing in Defendants' mere mention that the Company "generate[d] sales from both the sales of the EPMs and the sale of professional services" suggests that the Company would satisfy its obligations under the revenue metrics, and so Plaintiffs' explanation of how such a statement was misleading fails to state a claim.  Plaintiffs allege repeatedly that Defendants assured investors that they had reached an "agreement in principle" with the Postal Service to amend the revenue requirements when no such agreement in principle had actually been reached (see, e.g., Am. Compl. ¶¶ 98, 102, 119), but the press releases from which the Plaintiffs selectively quote in support of this argument make clear that Defendants maintained that "there [was] no guarantee" that the Company would reach an agreement and that it was Defendants' own belief that they had reached this agreement in principle, not that an agreement

---

[2] For the same reasons, Plaintiffs' claims are dismissed to the extent they are premised on a contention that Defendants Botti and Bunt had a duty to disclose arising from their insider status at the time that they sold Authentidate shares in late 2003, several months before the July 2004 first revenue metric deadline.

in principle had actually been reached. (See id. ¶ 98.)[3] Therefore, the explanations pled in the complaint as to why such a statement was misleading fail to make out a plausible claim.

Plaintiffs argue in their opposition papers that Authentidate's statement in February 2004 that there was "no event, occurrence or development that has had or that could reasonably be expected to result in a Material Adverse Effect" was rendered misleading by the omissions. However, this allegedly misleading statement was not pled in the complaint and, in any event, there is nothing beyond conclusory assertions in the opposition papers as to why this statement was misleading. See 15 U.S.C.A. § 78u-4(b)(1) (West 1997) ("the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed."). Therefore, the "Material Adverse Effect" statement would not be actionable even if it, along with the accompanying explanations or lack thereof, were actually pled in the complaint.

The remaining statements cited by Plaintiffs, such as "[t]his alliance exemplifies our solutions-based approach to commercializing the USPS EPM on a broad scale," "[t]his is truly an exciting milestone for Authentidate, representing high-volume EPM usage and demonstrating the success of our solutions-based approach to commercialize the EPM", "we anticipate strong revenue growth as the [EPM] service is now live," "we believe the sales increases indicate traction is beginning in our Authentidate segment," "we believe there are some exciting opportunities ahead of us," "our deferred revenue increased 121%, which we believe is a

---

[3] Indeed, in one of the challenged statements, Defendant Waters merely stated that the Company had done a few things that they "thought" put them back in compliance with the revenue metrics. (Am. Compl. ¶ 119.)

strong indication of success going forward," "this company has never been on [sic] financial footing and has never had a stronger balance sheet," and "the revenue growth we experienced this past quarter is but a small example of what we believe is attainable over the coming quarters" (Am. Compl. ¶¶ 50, 52, 55, 64, 80, 83, 92, 108, 116, 122, 124, 126, 129), are merely optimistic expressions of belief of the Company's potential for improved future performance that are too vague to be material.  See In re NTL, Inc. Securities Litigation, 347 F. Supp. 2d 15, 34 (S.D.N.Y. 2004) ("[that] defendants allegedly had earlier knowledge of declining revenue or subscriber numbers does not mean that they had no adequate basis for releasing optimistic statements."); id. ("Vague expressions of optimism, or puffery, are insufficient to support a claim for securities fraud."); Rombach v. Chang, 355 F.3d 164, 174 (2d Cir. 2004) (citing Shields v. Citytrust Bancorp, Inc., 25 F.3d 1124, 1129-30 (2d Cir. 1994) ("Up to a point, companies must be permitted to operate with a hopeful outlook: 'People in charge of an enterprise are not required to take a gloomy, fearful or defeatist view of the future; subject to what current data indicates, they can be expected to be confident about their stewardship and the prospects of the business that they manage.'").  Accordingly, claims premised on such statements cannot survive Defendants' motion to dismiss.

    For all the above reasons, no duty to disclose the alleged omissions has been plausibly pled, and Plaintiffs' claims are dismissed to the extent that they are premised on the existence of such a duty and to the extent that they assert that any of the above referenced statements were themselves false or misleading.

Analysts' Statements

Plaintiffs also claim that Defendants are liable for statements by stock market analysts and in trade publications which stated, among other things, that Authentidate was a "strong buy" and described the relevant software as a "potential killer application" because the technology's promising nature could have resulted in widespread use comparable to that of e-mail. (See Am. Compl. ¶¶ 55-60.) Plaintiffs allege that Defendant Botti provided "specific estimates for EPM revenues" to the analyst and that the estimates were "unreasonably optimistic." (Id. at ¶ 56.) The addition of this single conclusory allegation, however, is insufficient to cure the deficiency noted in the Court's previous dismissal of Plaintiffs' complaint. See In re Authentidate, 2006 WL 2034644, at *5 ("They merely assert in a conclusory fashion, without specific factual support, that a report by an analyst was based on Defendants' materially false and misleading statements"). Moreover, nothing in the analyst's statement explicitly premises its buy recommendation on an estimate by any Defendant that EPM revenues would be high; rather, the recommendation is premised on the nature of the technology and is expressly conditioned on an assumed, rather than a predicted, "modest adoption rate." (Am. Compl. ¶ 55.) Accordingly, Plaintiffs' claims based on the analyst reports are dismissed.

Because Plaintiffs' Section 10(b) claims are dismissed in their entirety for the aforementioned reasons, it is unnecessary for the Court to address the parties' arguments concerning scienter, the group pleading doctrine, the "safe harbor" of the Reform Act, or the "bespeaks caution" doctrine.

Control Person Claims

        Plaintiffs' remaining claims assert secondary liability against all of the individual Defendants as "control persons" under Section 20(a) for the 10(b) claims. Plaintiffs' primary Section 10 (b) claims against Defendants have been dismissed and therefore no primary violation has been plausibly pled. Accordingly, Plaintiffs' Section 20(a) control person claims must also be dismissed.

Leave to Replead

        Plaintiffs seek leave to replead any claims dismissed by this Court. The Plaintiffs have already filed two prior complaints in this action and, in its prior Opinion and Order dismissing Plaintiffs' claims with leave to replead, the Court provided sufficient guidance with respect to the heightened pleading standards Plaintiffs would have to meet in order to state a claim. Accordingly, Plaintiffs' request for leave to replead is denied. See ATSI Commcn's, 493 F.3d at 108 ("the district court had already dismissed [Plaintiffs'] first amended complaint for failure to meet Rule 9(b) and the PSLRA's pleading requirements on many grounds similar to its final dismissal. District courts typically grant plaintiffs at least one opportunity to plead fraud with greater specificity when they dismiss under Rule 9(b) . . . [and Plaintiffs were] given that opportunity. The district court did not abuse its discretion in declining to grant further leave to amend.").

## CONCLUSION

        For the foregoing reasons, Plaintiffs' claims are dismissed with prejudice. The

Clerk of Court is respectfully requested to terminate Docket Entry No. 68, enter judgment for Defendants and close this case. The Clerk of Court is also requested to close the following member cases: 05-cv-5386, 05-cv-5758, 05-cv-5842, 05-cv-6520 and 05-cv-6898.

SO ORDERED.

Dated: New York, New York
March 23 2009

LAURA TAYLOR SWAIN
United States District Judge